UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:06CR693 CDP |
| | ) | |
| DWAYNE BOWDEN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the Defendant's motion to suppress evidence and statements on July 9, 2007. At the hearing on the motion, the Government presented evidence relating to a May 25, 2006, traffic stop of the Defendant and an October 18, 2006, search warrant of the Defendant's house. The Defendant is indicted for offenses that allegedly occurred on October 18, 2006. The Government will presumably attempt to introduce evidence of the May 25, 2006 incident as evidence admissible under 404(b), Federal Rules of Criminal Procedure. The undersigned's findings of fact and conclusions of law as to both incidents are as follows:

**Findings of Fact**

Michael Betz is a police officer with the Metropolitan St. Louis Police Department. From at least May through August, 2006, Betz was assigned to the Central Patrol Division Gang Task Force. Along with agents of the Alcohol, Tobacco and Firearms ("ATF"), gang task force officers were investigating outside or street sales of narcotics apparently by an organized group of individuals in the Gibson Street area. The Defendant Bowden was a target of this joint investigation, and Betz had

come in contact with the Defendant on several occasions during this and other drug investigations. According to the affidavit filed in support of the search warrant, Bowden was a major source of crack cocaine in the Gibson Street area and delivered cocaine to individuals for sale.

On May 25, 2006, Betz and two other officers were on duty and were driving an undercover vehicle in the area of Laclede and Vandeventer Avenues. The officers observed the Defendant's vehicle, which they recognized, drive by their vehicle on Vandeventer at the intersection of Laclede and Vandeventer. Because the officers recognized the Defendant's vehicle, they decided to follow it onto Vandeventer. Shortly after starting their surveillance of the Defendant's vehicle, they observed the vehicle to be weaving from lane to lane without signaling, which is a traffic violation. They followed the car for some distance, and observed the vehicle eventually pull to the curb without signaling. The officers slowed their vehicle and drove by the Defendant's vehicle for some distance, eventually making a U-turn on Vandeventer and driving back by the Defendant's vehicle for a second time. As they drove by the vehicle for the first time, they observed the Defendant was driving the vehicle. During this entire time, Betz (who was seated in the rear seat of the police vehicle and who maintained continuous visual contact with the Defendant's vehicle) observed a male come from a vacant lot where the car was stopped, go up to the driver's side window of the vehicle, complete a hand-to-hand transaction with the Defendant, and then disappear into a vacant lot.

After passing the Defendant's car for a second time, the officers made a second U-turn on Vandeventer, and pulled in behind the Defendant just as he started to drive away from the curb. They followed the Defendant a short distance and curbed the vehicle by activating a red light on the dashboard of their car. After the Defendant pulled the car to the curb, Betz approached the driver's side of the vehicle while another officer approached the passenger side. As Betz was just about to

2

reach the driver's side window, Betz heard his partner state, "He's reaching for something." At this point, Betz told the Defendant, "Show me your hands." The Defendant did not comply with this request, and Betz simultaneously observed the Defendant lean over toward the center console of the van and drop a small item from his hand onto the console while at the same time attempting to conceal the small item underneath a soda can. At this point, Betz grasped the Defendant's arm and told him to get out of the van. When the Defendant did not immediately comply, Betz opened the door of the van and removed the Defendant from the van. After the Defendant and the other passengers were out of the van, Betz looked on the console and saw a small rock of what he believed to be crack cocaine next to a can that had been turned over. Betz stated that he had interrupted the Defendant's effort to conceal the rock of cocaine under the can when he grabbed the Defendant's arm, and believed that the can was knocked over at that point.

On October 17, 2006, Det. Betz and Det. Garrett Burgess made application for a search warrant to search Defendant's safe house at 4115 North Florissant in St. Louis, Missouri. The affidavit in support of the application for the search warrant as sworn to by Det. Burgess before Judge Elizabeth Hogan of the Twenty-Second Judicial Circuit is as follows:

Burgess and other detectives were involved in an ongoing joint operation with agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") wherein they were investigating gang members who were involved in drug dealing in the Gibson Street area of the Forest Park Southeast Neighborhood in the City of St. Louis. The gang was known as the Gibson Street Posse, and their investigation revealed that Dwayne Bowden was a documented gang member of that gang, and was a major supplier of cocaine to the gang. During the investigation, surveillance in the Forest Park Southeast Neighborhood revealed that agents observed Dwayne Bowden making deliveries of what

they believed to be crack cocaine to Gibson Street Posse gang members. During the investigation, the agents and detectives became familiar with the vehicles that Dwayne Bowden uses during his drug activities, and on August 30, 2006, Det. Betz stopped one of Dwayne Bowden's vehicles, and found that the driver of the vehicle was Tonyetta Jones, whom the officers knew to be the Defendant's girlfriend. Also discovered in the car were $5,000 in cash and crack cocaine. After Jones' arrest, Dwayne Bowden called the central patrol division of the police department and stated that the money was his, however, he could produce no proof of ownership. Further, prior to Tonyetta Jones' arrest, the officers had observed the vehicle in which she was arrested parked in front of 4115 North Florissant. In addition, on October 12, 2006, Det. Burgess made contact with a confidential informant whose information had proven reliable in the past. The informant told Burgess that Dwayne Bowden was keeping large amounts of cocaine in crack and powder form, a large amount of currency, and weapons at a safe house that Dwayne Bowden uses on the second floor at 4115 North Florissant. The informant said that Bowden uses this house to store his illegal narcotics and to cook up crack cocaine. In addition, a second confidential source which was developed by ATF stated that Dwayne Bowden was a major crack cocaine supplier to the Gibson Street Posse, and that after Dwayne Bowden's girlfriend's arrest, he had been staying close to his safe house at 4115 North Florissant. The agents conducted intermittent surveillance at 4115 North Florissant during the course of the investigation, and found that both vehicles, which they were aware that Dwayne Bowden had been using, had been parked in front of 4115 North Florissant. In addition, the agents followed Bowden from the Forest Park Southeast Neighborhood to 4115 North Florissant, and watched him enter the second floor of that residence on numerous occasions.

In addition, the detectives also conducted surveillances of the apartment during the dates October 14 through October 16, 2006, after they had received information that Bowden was storing large amounts of cocaine in the apartment. During these surveillances, they observed several individuals knock on the door of the second floor apartment at 4115 North Florissant, and observed a male, who matched Bowden's description, answer the door, allow the individuals into a downstairs hallway, meet with them for a short time, after which the officers observed the individuals leave the premises. The officers told the judge that in their experience, that method of operation is indicative of a safe house or crack house that stores and sells illegal drugs. Based on the above affidavit, Judge Hogan issued a warrant to search 4115 North Florissant, Second Floor, and to seize crack and powder cocaine, other illegal narcotics, personal papers, weapons, scales, and U.S. currency.

Also on October 17, 2006, Betz obtained an arrest warrant from the Circuit Attorney's Office and from the Circuit Court relating to the May 25, 2006 incident detailed above. The Circuit Attorney's Office had taken the matter under advisement and issued the warrant when a large number of arrests and search warrants were conducted pursuant to the joint ATF/St. Louis Police Department investigation on October 18, 2006.

On October 18, 2006, Betz and other officers went to 4115 North Florissant to execute the search warrant and the arrest warrant. An entry team made initial entry into the residence pursuant to the search warrant, and rendered the residence safe by determining who was in the apartment and detaining those individuals. Betz entered the apartment approximately two minutes after the entry team, and immediately observed the Defendant seated on the floor between the kitchen and the living room area in handcuffs. He went immediately to the Defendant, told the Defendant that he was under arrest pursuant to the arrest warrant, and that the agents were executing a search warrant. He

informed the Defendant of his complete Miranda rights by reading his rights to him from a police department Miranda card. The Defendant told Betz that he understood his rights. The Defendant did not, however, make a statement in this matter.

Betz was the seizing officer in this case, and he observed an AR-15 assault rifle, which had been underneath a couch in the living room area against a wall at the back of the couch; crack cocaine seized from underneath the cushions on that same couch; photographs seized from the premises; a scale from the kitchen area; a boot, and more crack cocaine. The boot was seized because some of the cocaine was found in the boot. This cocaine was discovered when the officers took Bowden back to his bedroom so he could dress himself prior to being taken to the police station. When the officers entered the premises, Bowden was sleeping and was not fully clothed. When it came time for Bowden to put on his shoes, he reached for a pair of boots to put on his feet, however, Betz looked into the boots before allowing the Defendant to put them on in order to make sure that there was no contraband or anything else in the boots. When he did so, he observed two packages of crack cocaine in the boots and seized them.

**Conclusions of Law**

A. The Stop and Search of the Vehicle on May 25, 2006

Based on the above, the undersigned concludes that the stop of the Defendant's van on May 25, 2006, was lawful as a valid traffic stop, and also as a stop consistent with the case of Terry v. Ohio, 392 U.S. 1 (1968). Further, the undersigned concludes that upon observing the Defendant's conduct when approaching the car, the officers, at that point, possessed probable cause to believe that the Defendant was secreting contraband in his vehicle and, thus, had probable cause to search the area of the vehicle where they observed the Defendant trying to hide an item.

As to the initial stop of the Defendant, both the Supreme Court and the Eighth Circuit Court of Appeals have held that, "Any traffic violation however minor, provides probable cause for a traffic stop." United States v. Maza, 93 F.3d 1390, 1396 (8th Cir. 1996); Whren v. United States, 116 S.Ct. 1769 (1996). In the present case, the officers observed the Defendant change lanes without signaling, as well as pulling to the curb without signaling, all violations of the traffic code of the City of St. Louis. The evidence showed that they stopped the vehicle, and eventually issued the Defendant citations for these traffic violations. Therefore, the undersigned concludes that the initial stop of the Defendant was lawful.

In addition, in Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop a person reasonably suspected of criminal activity, question the person briefly to determine whether the officer's suspicions are justified, and conduct a pat down search for weapons if the officer reasonably believes that the person presents a risk to his safety or the safety of another. See Terry v. Ohio, supra. Whether or not officers possess reasonable suspicion is to be determined by the court "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996). Courts afford a great deal of deference to the conclusions of an officer because the officer may detect criminal activity from conduct that seems innocuous from an untrained eye. United States v. Cortez, 449 U.S. 411, 418-22 (1981). In addition, regarding the search of the top of the console by Betz at the scene of the stop, a warrantless search of an automobile does not violate the Fourth Amendment when there is probable cause to believe that the vehicle contains contraband or other evidence of criminal activity. See United States v. Boucher, 909 F.2d 1170, 1175 (8th Cir. 1990); Arkansas v. Sanders, 442 U.S. 753 (1979). In dealing with the probable cause standard, the Supreme Court has stated as follows:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949). Probable cause is a "fluid concept turning on the assessment of probabilities on particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of circumstances present. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime would be found in the area to be searched. It is also clear that even an anonymous tip from a crime stopper's hotline or an informant whose reliability has not been tested is sufficient upon which to create probable cause as long as there is adequate corroboration of even innocent details. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

In United States v. Alverez, 235 F.3d 1086 (8th Cir. 2000), a Nebraska state trooper was investigating a vehicle which had a flat tire at a rest stop in Grand Island, Nebraska. The trooper found the owner of the vehicle and asked the owner where he was traveling from and where he was headed to. The owner stated that he was coming from California and was going to Chicago, but was only planning on staying a few days, a response that the trooper found suspicious. He told the trooper that his friend was obtaining a kit with which to patch the flat tire. Eventually, the friend returned with tire sealant, and the two began to patch the tire. During this time, the trooper (with defendant's permission) looked in the trunk of the defendant's vehicle, and observed a fully inflated spare tire in the trunk. Upon picking up the tire, he noticed that there were thudding noises inside

8

the tire. The trooper then cut through the tire's sidewall and exposed approximately seven pounds of methamphetamine. The Court held that, at this point, given the responses by the defendant, the fully inflated spare tire, and the thudding noises, that there was probable cause to search the tire. In so holding the Court stated as follows:

> The thudding sound produced by the tire as it was being inspected indicated that it was being used as a container. Because the troopers had probable cause to believe that contraband was secreted in the vehicle, in particular in the spare tire, they could lawfully complete a full and thorough search of the tire, including dismantling or damaging it. . .Accordingly, the court did not err in denying Alverez's motion to suppress.

235 F.2d 1086, 1089.

In United States Mercado, 307 F.3d 1226 (10th Cir. 2002), a defendant with a disabled vehicle left it at a repair shop, however, initially refused to allow his keys to be dropped off with the vehicle and locked his vehicle every time he left it to talk to the mechanic about repairing the vehicle. In addition, the defendant wanted to know if he could have the vehicle towed some three hundred and fifty miles from Salt Lake City, Utah to Denver, Colorado, even though the repair of the vehicle would have been much cheaper and possibly could have been completed prior to getting a tow truck to take the vehicle to Denver. In addition, a state trooper observed from the outside of the van that the vehicle contained a lowered ceiling of some type. In holding that this was sufficient to show probable cause, the Court stated as follows:

> Courts should "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." . . .Therefore, we hold that appellant's strange behavior toward his minivan was sufficient to give the officer probable cause to believe that he was trying to hide contraband.

307 F.3d 1226, 1231.

Given the above facts, the undersigned concludes that the search of the console area of the Defendant's van and the seizure of the crack cocaine was based on probable cause and was, therefore, lawful.

As stated above, the detectives along with agents of ATF were conducting an investigation into outdoor or street sales of crack cocaine in the Forest Park Southeast Neighborhood of St. Louis. The Defendant was a target of this investigation, and the officers had come in contact with him on numerous occasions during this and previous investigations. Detectives were also aware that the Defendant was a source of cocaine in this area, and delivered cocaine to other individuals in the area for resale. On May 25, 2006, they observed the Defendant in this Forest Park Southeast area and followed him to determine what he was up to at that time. They first observed the Defendant commit a traffic violation, and then observed the Defendant pull to the curb, and observed a male come from a vacant lot where the Defendant's van was stopped, go up to the driver's side window of the van, complete a hand-to-hand transaction with the Defendant, and then disappear back into the vacant lot.

Even without the information that the officers possessed about the Defendant's narcotics trafficking, the undersigned concludes that this activity would be suspicious. The undersigned further concludes that, when coupled with the officers' information about the Defendant, the hand-to-hand transaction conducted in this manner makes it highly suspicious that the Defendant may have been taking part in the transfer of drugs. It is clear from the affidavit filed in support of the search warrant, that these officers were aware that this type of short transactional activity was indicative of drug transactions.

The undersigned concludes that at this point the officers had ample reasonable, articulable suspicion that the Defendant was involved in criminal activity and, thus, could stop the Defendant in

order to conduct an investigation to confirm or dispel their suspicions. See Terry v. Ohio, 392 U.S. 1 (1968). In addition, the Defendant could be stopped because he had committed a traffic violation.

As soon as Det. Betz approached the driver's side window after the stop, he observed the Defendant reaching over toward the console of the van, and told him immediately to show him his hands. The Defendant did not comply with this directive and continued reaching for the console. Betz observed the Defendant drop a small item on the console and then attempt to hide the item by placing a soda can on top of it. At this point, the undersigned concludes that Betz had a reasonable belief that the Defendant was attempting to conceal contraband (probably crack cocaine) on the console of the car underneath the can. The information which Betz possessed about the Defendant's drug dealing, the suspicious hand-to-hand transaction, and the attempt to conceal a small item while ignoring Betz's command to show him his hands all lead the undersigned to conclude that there was at least a "fair probability" that the Defendant was concealing crack cocaine on the console just as there was probable cause in Alverez and Mercado, supra. Therefore, the undersigned concludes that the motion to suppress the cocaine seized from the vehicle should be denied.

B. The Search of 4115 North Florissant

Based on the above findings, the undersigned concludes that sufficient probable cause exists to authorize the issuance of the search warrant to search 4115 North Florissant in St. Louis. For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948);

Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949).

Probable cause is a "fluid concept turning on the assessment of probabilities on particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213-232 (1983). Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of the circumstances present. All that need by shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. It is also clear that information from a reliable informant, without more, may provide probable cause of issuance of a search warrant. See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1982). In addition, even an anonymous tip from a crime stopper's hotline or an informant whose reliability has not been tested is sufficient information upon which to create probable cause as long as there is adequate corroboration of even innocent details. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

Based on the above, the undersigned concludes that there was sufficient probable cause shown in the affidavit to search the premises for evidence of drug dealing, including cocaine, drug paraphernalia, weapons, and currency. The affidavit states that the detectives, during their joint investigation with ATF, became aware that the Defendant was a major supplier to the Gibson Street

Posse in the Forest Park Southeast Neighborhood of the City of St. Louis. It stated that they observed Bowden making deliveries of what they believed to be crack cocaine to Gibson Street Posse members. The affidavit further shows that the information was corroborated both by the arrest of Dwayne Bowden on May 25, 2006, in possession of crack cocaine, and the arrest on August 30, 2006, of his girlfriend driving one of his vehicles containing crack cocaine and $5,000 in cash. Dwayne Bowden told officers after the arrest that the cash was his money. In addition to this, the officers received information on October 12, 2006, from a reliable informant that Bowden was keeping large amounts of crack cocaine, currency, and weapons at a safe house that he uses on the second floor of 4115 North Florissant. In addition, a second informant told the agents that Bowden was alarmed by the arrest of his girlfriend on August 30, 2006, and was staying close to his safe house at 4115 North Florissant. In addition, after the information was received that Bowden was storing drugs, on October 12, 2006, the agents conducted a surveillance at 4115 North Florissant between October 14 and October 16, 2006. During this time frame, they observed several individuals go to 4115 North Florissant, be admitted by a person who fit Bowden's description, stay a short time, and exit the premises. The agents believed that, based on the their experience, this activity was indicative of both a safe house and a crack house that sells and stores cocaine.

Given the above, the undersigned concludes that there is a least a "fair probability" that the agents would find the items requested in the search warrant in the premises. The informant stated that guns, drugs, and other paraphernalia would be found in the premises, which was corroborated by the surveillance, and the Defendant's general drug-dealing activities were corroborated by surveillance of the officers and they arrested the Defendant and his girlfriend in possession of cocaine. Therefore, based on all of the above, the undersigned concludes that there was probable cause for the

issuance of the search warrant. In addition, all of the items seized were seized pursuant to and authorized by the warrant. This includes the assault rifle, cocaine, and paraphernalia. The assault rifle further could be seized as being found during the search of the premises and being evidence of a safe house or drug-dealing activity. In addition, the search of the boot while the Defendant was getting dressed was also a search pursuant to the warrant of an area in which drugs could be found and were found. Therefore, the undersigned concludes that seizure of the items found on the premises should not be suppressed.[1]

## Conclusion

Therefore, the undersigned concludes that the Defendant's motion to suppress evidence should be denied and motion to suppress statements be denied as moot.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant Bowden's Motion to Suppress Evidence and Statements (Doc. #21) be **denied in part and denied as moot in part**.

Further, the parties are advised that they have until **August 20, 2007**, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Finally, the trial of this matter is set on **September 24, 2007 at 9 a.m.**, before the Honorable Catherine D. Perry, United States District Judge, Courtroom 14-South.

---

[1] It should also be noted that the Defendant filed a motion to suppress statements in this matter. However, the undersigned heard no evidence of any statements or admissions given by the Defendant that the Defendant has stated should be subject to suppression. Therefore, the motion to suppress statements will be denied as moot.

/s/ Terry I. Adelman
                        UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of August, 2007.